UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK EARL TYSON,

             Petitioner,

                                    CASE NO. 2:22-CV-11632
v.                                  HON. NANCY G. EDMUNDS

B. CARL,

             Respondent.

_____/

## OPINION & ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, & DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

**I.    Introduction**

This is a *pro se* habeas case brought pursuant to 28 U.S.C. § 2254. Frank Earl Tyson ("Petitioner") was convicted of felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a weapon during the commission of a felony, second offense, Mich. Comp. Laws § 750.227b, following a jury trial in the Oakland County Circuit Court.   He was sentenced, as a fourth habitual offender, Mich. Comp. Laws § 769.12, to consecutive terms of 4 years 10 months to 40 years in prison and 5 years in prison in 2015. During the pendency of this case, he was released on parole with a supervision discharge date of June 10, 2025.   *See* Petitioner's Offender Profile, Michigan Department of Corrections Offender Tracking Information System ("OTIS"),

https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=306811.

In his pleadings, Petitioner raises claims concerning the validity of his sentence, the police investigation, the retention and suppression of evidence and his right to present a defense, and the effectiveness of trial and appellate counsel.   For the reasons set forth, the Court denies the petition for a writ of habeas corpus, denies a certificate of appealability, and denies leave to proceed in forma pauperis on appeal.

## II.    Facts and Procedural History

Petitioner's convictions arise from an altercation with a man named Milan Orr, a competitor for the attention of India Hollis, the mother of Petitioner's child, on December 26, 2012 in Pontiac, Michigan.   The Court adopts the detailed description of the trial testimony set forth by defense counsel in Petitioner's brief on direct appeal to the extent that those facts are consistent with the record.   Those facts are as follows:

> The complainant, Milan Orr, and Mr. Tyson told two diametrically opposed stories. Mr. Orr claimed that Mr. Tyson assaulted him from behind in a surprise attack, robbed him, and shot him, when he went to pick-up Mr. Tyson's ex-girlfriend for a pre-arranged date. (*See, generally*, T I 239-266; T II 5-44). Mr. Tyson claimed he acted in self-defense and that there was no robbery. Mr. Tyson claimed that Mr. Orr showed up unexpectedly when he was at home with his girlfriend, that Mr. Orr instigated a fight with him, during which Mr. Orr started to pull a gun on him, and that the gun discharged as they struggled over it. (*See, generally*, T II 9-146).
>                                  ***

<u>Mr. Orr's Version</u>

Mr. Orr testified that he had a pre-arranged date with India Hollis on December 26, 2012. (T I 242). Before he arrived at Ms. Hollis' residence, Ms. Hollis had told him that she arranged for her aunt, Amelia, who lived in the upstairs flat, to babysit her children while they went out for the evening and that he should bring some beer and money to compensate Amelia for watching them. (T I 242-244).

Mr. Orr arrived around 8 or 8:30 pm in his Cadillac Deville, and parked in the driveway. (T I 245). He phoned Ms. Hollis from the driveway, and she told him to take the beer and money upstairs to Amelia. (T I 246-247).

As Mr. Orr began walking up the stairs, he was hit from behind in the back of the head a few times with something hard. (T I 246-248). He heard a male voice saying something like "I've been waiting on this" or "I've been waiting on you". (T I 248). Mr. Orr believed the assailant came from behind the door leading to the basement stairwell. (T I 248).

Mr. Orr turned and the two men began fighting. (T I 249). They fell down the stairs. (T I 249). Mr. Orr landed on top of the other man; it was then that he saw that it was Mr. Tyson. (T I 249-250). Mr. Orr claimed that a few days to a week before the December 26th incident, he was at Ms. Hollis' home engaged in oral sex with her in her bedroom when Mr. Tyson walked in on them. (T I 240-241; T II 40). Mr. Orr left the house as Mr. Tyson and Ms. Hollis argued, and Mr. Tyson gave him a "real hard" look. (T I 241-242; T II 27-28).

On December 26th, after the two men had fallen down the stairs, Ms. Hollis and her children came outside. (T I 249). The children were in their coats and hats. (T I 251; T II 15).

3

Mr. Orr called out to Ms. Hollis for help, but she just stood there as the two men wrestled and fought. (T I 251-252, 258; T II 15). Mr. Orr was bleeding from the head as the two men fought. (T I 249-250). He believed that Mr. Tyson must have hit him in the head with the gun he saw later, because Mr. Tyson did not have any other weapon that he saw. (T I 250).

Mr. Orr testified that after they wrestled more, he and Mr. Tyson both stood up. It looked to him as if Mr. Tyson was going to run off or something. (T I 251-252). As Mr. Tyson yelled at him, Mr. Orr lunged at Mr. Tyson. (T I 252). It was then that Mr. Orr saw a flash, heard a bang, and went down. (T I 252). His leg hurt. (T I 252).

Mr. Orr testified that as he was on the ground, Mr. Tyson ordered him to take his pants off. (T I 252, 254-256). Mr. Tyson was holding a small semi-automatic handgun, putting it in Mr. Orr's face and threatening to kill him. (T I 252-253, 255).

Mr. Orr removed his pants and shoes. (T I 254). His coat and hat had come off during the earlier struggle. (T I 254-255). He was left with only his underwear, shirt, and socks on. (T I 254).

Mr. Orr kicked his pants closer to Mr. Tyson at his direction. (T I 256). Mr. Orr testified that inside his pants was about $170, a set of keys, his wallet containing his bank card, and some other stuff. (T I 256, 263).

Mr. Tyson directed him to go into the basement. (T I 256-257). After Mr. Orr stood up, he started to fall, grabbed Mr. Tyson, and they both fell. (T I 257).

Mr. Orr heard Amelia yelling that she was calling the police. (T I 257). He then heard Mr. Hollis call out that the police were on the way. (T I 258).

Mr. Orr got up and took off running. (T I 257). He made his way to the next street, Lowell, and banged on the door of the first house he saw. (T I 257). The occupants of that house let him in, called the police, and looked after him until the ambulance and police arrived. (T I 257, 260; T II 19-20).

Mr. Orr testified that at the hospital he received stiches to the lacerations on his head and was treated for the gunshot wound. (T I 260-261). The bullet had hit his femur and hip, and the doctors advised him that it was best to leave the bullet in place where it was lodged in his body. (T I 260-261).

Mr. Orr never saw or heard from Ms. Hollis again. (T I 258). The next day her phone number was no longer in service. (T I 258).

Mr. Orr did not know how his coat and shoes got inside his car, where they were found. (T I 263-264; T II 19-20). His cell phone, which had been in his coat pocket, was also returned to him. (T II 19, 33). A few weeks later, Amelia found his car keys in the snow and returned them to him. (T II 32-33).

<u>Mr. Tyson's Version</u>

Mr. Tyson testified that he had been in and on-again/off-again relationship with Ms. Hollis since 2010, and that she is the mother of his child. (T II 104, 125). By December 26, 2012, Mr. Tyson had stayed the last three or four days at Ms. Hollis' residence. (T II 104-105).

Mr. Tyson testified that on December 26, 2012, Mr. Orr sent some text messages to Ms. Hollis earlier in the day and then, sometime between 8 and 9 pm, Mr. Orr showed up at the house. (T II 106). Mr. Tyson heard a knock at the back door and when he opened it, Mr. Orr was standing there. (T II 106). Mr. Orr asked where Ms. Hollis was. (T II 106). Mr. Tyson asked Mr. Orr who he was and why he wanted to see her. (T II 106). Mr. Tyson had not been expecting Mr. Orr to come over. (T II 124).

Mr. Tyson testified that he had seen Mr. Orr at various times over the years past, but never with Ms. Hollis. (T II 106). Mr. Tyson denied that there had been any incident in the prior week where he had walked in on Mr. Orr with Ms. Hollis. (T II 107).

On December 26th, at the back door, Mr. Orr tried to push past Mr. Tyson and into the house. (T II 107). Mr. Tyson blocked Mr. Orr with his arm and kind of pushed him back. (T II 107).

Mr. Tyson testified that Mr. Orr took a step back and reached toward his waist. (T II 107-108). Mr. Tyson believed that Mr. Orr was reaching for a gun, so he grabbed Mr. Orr's arms. (T II 107-108).

Mr. Tyson testified that they fell back, with Mr. Orr falling against the post in the middle of the stairs. (T II 108). Mr. Tyson tried to push Mr. Orr over the banister of the stairs, but he was not successful and they tussled. (T II 108). Mr. Tyson testified that Mr. Orr was bigger than him, and was "kind of overpower[ing] him". (T II 108).

As they tussled and swung at each other, they fell into the back wall of the porch area. (T II 108). Mr. Tyson made sure to keep a hold of Mr. Orr's arm. (T II 108-109).

Mr. Tyson testified that Ms. Hollis came down the stairs to where they had fallen, she grabbed a lamp and she hit Mr. Orr over the head with it. (T II 109). Mr. Tyson testified that the brown ceramic lamp had already been partially broken; the kids had broken it while playing in the house and they had put it outside on the porch intending to set it out with the trash later. (T II 109-110). Ms. Hollis hit Mr. Orr in the head with the lamp at least twice. (T II 110). This allowed Mr. Tyson to maneuver out from under Mr. Orr. (T II 110).

Mr. Orr tried to pull his gun out from his waistband, so Mr. Tyson grabbed at Mr. Orr's hands again. (T II 111). Mr. Tyson testified

that the gun went off as they struggled for it. (T II 111). When the gun went off, Mr. Tyson had his hands on Mr. Orr's hands, which were on the gun - - "so we were both holding it". (T II 111). The gun was outside of the waistband of Mr. Orr's pants, but still pointed down and close to Mr. Orr's body; Mr. Tyson was preventing Mr. Orr from raising it up to aim it at him (Mr. Tyson). (T II 111, 136-137).

After the gun discharged, Mr. Orr jumped back and Mr. Tyson was able to snatch the gun out of Mr. Orr's hand. (T II 111-112). Mr. Tyson asked Mr. Orr something like "what the hell is going on." (T II 112).

Mr. Orr advanced on Mr. Tyson even though he was holding the gun then. (T II 112).

Mr. Tyson then pointed the gun at Mr. Orr and said something like, "dude, you crazy mother fucker." (T II 112).

Mr. Orr brushed past Mr. Tyson and ran off. (T II 112). Mr. Orr ran off and around the corner. (T II 113).

Mr. Tyson was aware that Mr. Orr was bleeding from the top of the head and from the face, but did not realize that Mr. Orr was hit by the gunshot. (T II 116, 121). Mr. Tyson was also bleeding from the top of his head, where it struck the railing and he had cuts and scratches to his face as well. (T II 121).

Mr. Tyson threw the gun into the wooded area behind the house as far as he could. (T II 112). He testified that now that the threat was gone, he did not have a need to hold the gun. (T II 113, 123).

Mr. Tyson testified that he had not had any weapons of his own that night. (T II 122).

Mr. Tyson could hear Ms. Hollis arguing with her aunt. (T II 112). Mr. Tyson testified that Ms. Hollis' aunt was outside on her

7

balcony watching the entire time. (T II 113). Ms. Hollis told him that they needed to go because her aunt was calling the police. (T II 112-113).

Mr. Tyson was aware that at the time Ms. Hollis had a warrant out for her arrest for a probation violation on a conviction for felonious assault, in which he was the victim/complainant. (T II 114, 126). They got the kids, who were in their pajamas, into coats and walked two blocks over to Ms. Hollis' mother's house; he carried the kids. (T II 114, 146). Mr. Tyson denied that they got into a car and left. (T II 114-115).

Mr. Tyson testified that he did not take anything from Mr. Orr. (T II 116). He denied taking Mr. Orr's clothing, money, wallet, phone or anything. (T II 117). He denied ever touching Mr. Orr's car that night. (T II 122).

Mr. Tyson testified that he was with Ms. Hollis for another week to 10 days. (T II 115).

He did not go to the police about the incident, because he is from the streets and, as a result, he looked at it as no harm, no foul. (T II 115). Mr. Tyson did not know then that Mr. Orr had been hit by the gunshot. (T II 116, 122-123). He did not know there was a warrant for his arrest related to it until Ms. Hollis called him at work one day. (T II 115).

Mr. Tyson testified that Ms. Hollis ended up leaving the state in mid-January 2013. (T II 144). She had put their child up for adoption and she went to Tennessee. (T II 117-119). They were on bad terms when she left for Tennessee, and he did not believe that she would return to testify on his behalf. (T II 118). He had not wanted her to put their son up for adoption. (T II 119).

Mr. Tyson acknowledged that he had served in the military for about one year and been trained in hand-to-hand combat, including in disarming people. (T II 126, 141). But he was not

able to do that without injuring Mr. Orr in this instance, as he could not overpower him. (T II 126-127, 144).

During a traffic stop about fourteen months after this incident, on February 11, 2014, in Auburn Hills, Mr. Tyson gave the police false names for himself before eventually giving them his real name. (T II 82-85, 90-93, 135-136). He testified that he did so to try to avoid arrest and because he does not trust the police. (T II 135-136, 141-142). After the warrant was discovered regarding this case, the police arrested Mr. Tyson on the scene during this traffic stop. (T II 93-94).

The Investigation

Geraldine Sharp testified that a man came barging into her enclosed front porch, wearing just his boxer shorts, socks and a T-shirt on the night of December 26, 2012. (T II 46). His shirt was covered in blood. (T II 46). The man said that he was sorry, but that he feared they were chasing him. (T II 47). Ms. Sharp had him lay on the floor, got him a blanket, and called 9-1-1. (T II 47). When the police and paramedics arrived, she heard the man indicate that he was attacked at a nearby house. (T II 48).

Deputy Braddock testified that Mr. Orr was laying on Ms. Sharp's porch when he arrived, and had blood on his face and shirt. (T I 184, 193). Mr. Orr claimed that he had been robbed and beaten at gunpoint, and directed the police to a home around the corner and a few houses down. (T I 184). For all that he had been through, Mr. Orr seemed rather calm to the deputy. (T I 208).

Amelia Howard, Ms. Hollis' aunt, testified that she lived in the flat above Ms. Hollis and her toddler children. (T I 220-221, 226-227). Ms. Howard testified that Mr. Tyson was Ms. Hollis' on-again/off-again boyfriend but he did not live with her. (T I 222). Ms. Howard testified that Ms. Hollis had started dating Mr. Orr in the beginning of December 2012. (T I 223).

Ms. Howard was not expecting to babysit on the night of December 26, 2012 or to see Mr. Orr. (T I 223, 227, 234). She heard a car pull in the driveway and looked out and saw it was Mr. Orr's car. (T I 223). A while later, she heard some noise, a scream and a gunshot from the area in back of the house. (T I 224-225). At that point, she jumped up and went to her balcony in the front of the house. (T I 224, 229, 236).

Ms. Howard saw Ms. Hollis standing outside in front of the house with the kids in their snow suits and asked her what was going on. (T I 224, 230). Ms. Hollis replied that she did not know. (T I 224, 230).

Ms. Howard told Ms. Hollis that she had heard a gunshot so she was going to call the police. (T I 224, 230). At that point, Ms. Howard heard Ms. Hollis call out, "Nitti, come on, she's calling the police." (T I 235). Ms. Howard testified that "Nitti" is Mr. Tyson's nickname. (T I 235).

Ms. Howard was too afraid to look out at the back area of the house. (T I 224, 229).

Instead, she looked out the side window and saw somebody in the backseat of Mr. Orr's car. (T I 225). She called 9-1-1. (T I 225).

Ms. Howard testified that the person at the car closed the car door and walked off. (T I 225). Ms. Howard testified that this person who was wearing a black hoodie "looked like" Mr. Tyson, i.e. "[i]t was his description. I [saw] him walking before. It looked – in the back it looked like him." (T I 226). The prosecutor suggested that she meant that the person was the same build, had the same gait, and "those types of things" as Mr. Tyson, and Ms. Howard agreed. (T I 226). She was "pretty sure" it was Mr. Tyson. (T I 231).

Deputy Braddock went to the two-flat home on Wesson street. (T I 186). He walked up the driveway to an area where he saw the snow was disturbed by the garbage area and stairwell. (T I 187-188). He also saw a bloody cap and blood in the snow. (T I 187-188). He observed blood drippings in the stair well, on the back porch, and on the railing. (T I 188-190).

Additionally, Sergeant Hunt saw blood on the first couple of steps leading up to the second floor. (T II 53, 75-76).

Deputy Braddock also observed pieces of what he thought was a broken ceramic vase laying throughout the area, on the porch and in the yard. (T I 188-189, 202). It appeared to have been shattered. (T I 203). Sgt. Hunt observed the broken pieces, which were collected, on the porch area in front of the stairs. (T II 61, 74).

The police briefly entered the lower flat to make sure there were no additional victims, no suspect, or no witnesses inside. (T I 190-191; T II 53-54). They found nothing of interest in the home. (T I 191; T II 54).

The police found Mr. Orr's Cadillac Deville in the driveway. (T I 191). Inside of the car, on the floor board of the back seat, there was a coat with some blood on it and a pair of boots that were still wet from the snow. (T I 191-192, 194-195, 212; T II 54-55). But Mr. Orr' pants, his wallet, and his keys were not in the car. (T II 55, 58).

Deputy Braddock found footprints or foot impressions in the snow on the porch area. He could not say from how many people. (T I 216). The snow was disturbed a lot up there, like "Twister", like a scuffle had occurred. (T I 217). The police did not find any beer bottles, either broken or intact, in the porch area or around it. (T I 204; T II 65).

11

Deputy Braddock found footprints or foot impressions in the snow that went away from the porch toward the house on Lowell where Mr. Orr went. (T I 205, 209-210, 213, 218) He found other footprints or foot impressions that went in the opposite direction on Wesson toward Branch and seemed to end there at some tire tracks, as if "those footsteps got into a vehicle." (T I 205-206, 209-210, 213). Deputy Braddock could not tell whether a barefoot or some type of shoe had made any of the impressions in the snow. (T I 214). He believed that in each direction away from the porch there was one continuous set of footprints/foot impressions. (T I 215-216).

Sgt. Hunt concurred in these observations, but opined from them based on his investigation that Mr. Tyson must have left the single set of impressions headed down Wesson toward Branch. (T II 68-73).

The defense, and at times the jury, questioned the thoroughness of the police investigation. The police searched the immediate surrounding area of the Howard/Hollis two flat home, but not any of the adjoining property. (T II 64). The police made no attempt to obtain fingerprints from any items of evidence, including Mr. Orr's car or the broken ceramic pieces, etc, despite the Sheriff's Department having its own lab. (T II 61-67, 72, 79). The police made no attempt to collect samples of the blood for testing/identification purposes, and acknowledged that the suspected blood observed could have been from either man or both. (T II 67-68). The police did not check phone records to see whether or not there had been contact between Mr. Orr and Ms. Hollis on December 26, 2012, though they could have done so. (T II 79).

It was stipulated between the parties that Mr. Tyson had previously been convicted of a specified felony and that he had not met the requirements for regaining eligibility to possess a firearm. (T II 97-98).

Pet. App. Brf., ECF No. 18-4, PageID.891-902 (text and footnotes omitted).

At the close of trial, the jury acquitted Petitioner of the armed robbery and assault charges and their associated felony firearm charges, but convicted him of felon in possession of a firearm and its associated felony firearm charge. (T III 11-12).

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising claims concerning the jury instructions for self-defense relative to the felon in possession and felony firearm charges, the effectiveness of trial counsel, the validity of his sentence, and the lack of investigation/suppression of evidence.   The Michigan Court of Appeals affirmed his convictions, but remanded for a *Crosby* hearing.   *People v. Tyson*, No. 325986, 2016 WL 3542384 (Mich. Ct. App. June 28, 2016) (unpublished).   Petitioner filed an application for leave to appeal, as well as a motion to remand, with the Michigan Supreme Court, both of which were denied.   *People v. Tyson*, 500 Mich. 934, 889 N.W.2d 253 (2017).

On remand, the trial court conducted a *Crosby* hearing and declined to re-sentence Petitioner finding that it would not have imposed a materially different sentence had it known that the sentencing guidelines were only

advisory.  *See* 4/13/17 Hrg. Tr., ECF No. 18-2; *People v. Tyson*, No. 14-249733-FC (Oakland Co. Cir. Ct. May 1, 2017), ECF No. 18-5, PageID.1071.

Petitioner filed an appeal of right with the Michigan Court of Appeals challenging the re-sentencing denial and the proportionality of his sentence. Following additional proceedings in the state appellate courts, the Michigan Court of Appeals ultimately affirmed Petitioner's upward departure sentence finding that it was both reasonable and proportionate.  *People v. Tyson*, No. 338299, 2020 WL 256955 (Mich. Ct. App. Jan. 16, 2020).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied.  *People v. Tyson*, 505 Mich. 1134, 944 N.W.2d 715 (2020), recon. den. 506 Mich. 921, 948 N.W.2d 588 (2020).

Petitioner then filed a motion for relief from judgment with the state trial court raising claims concerning several constitutional amendments, the non-disclosure of exculpatory evidence, compromise verdict, the effectiveness of trial and appellate counsel, his actual innocence, and jurisdictional defect, but only briefing issues alleging that he made an adequate showing of self-defense and should have been acquitted of the felon in possession and felony firearm charges and that his sentence violated Michigan's Self Defense Act.  The trial court denied the motion citing Michigan Court Rule

14

6.508(D)(2) and (3).   *People v. Tyson*, No. 14-249733-FC (Oakland Co. Cir. Ct. July 1, 2021), ECF No. 18-2.   Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied for failure to establish that the trial court erred in denying the motion for relief from judgment.   *People v. Tyson*, No. 360215 (Mich. Ct. App. June 22, 2022).   Petitioner did not appeal that decision to the Michigan Supreme Court.

Petitioner thereafter filed his federal habeas petition.   He raises the following claims:

I.   Sentences and convictions violate state laws and are considered void resulting in cruel and unusual punishment and due process violations.

II.   Suppression of evidence negated his right to a fair trial.

III.   Ineffective assistance of trial and appellate counsel.

ECF No. 1.   Respondent filed an answer to the habeas petition contending that it should be denied because portions of two of those claims are barred by procedural default and all of the claims lack merit. ECF No. 16.   Petitioner filed a reply to that answer.   ECF No. 21.

15

## III.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions.   The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result

different from [that] precedent.'"  *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case."  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.   "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must be more than incorrect or erroneous.   The state court's decision must be 'objectively unreasonable.'"  *Wiggins*, 539 U.S. at 520-521 (citations omitted); *see also Williams*, 529 U.S. at 409.   "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The United States Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so

long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). A habeas court "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. Thus, in order to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*.; *see also White v. Woodall*, 572 U.S. 415, 419-420 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court

18

decision to be reasonable.  *Woods v. Etherton*, 576 U.S. 113, 118 (2016).

Section 2254(d)(1) limits a federal court's review to determining whether a state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision.  *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-126 (2008); *Lockyer*, 538 U.S. at 71-72.

Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100.  Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of "clearly established law" are determined solely by Supreme Court precedent.  Thus, "circuit precedent does not constitute

'clearly established Federal law, as determined by the Supreme Court,'" and "cannot form the basis for habeas relief under AEDPA."   *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam).   The decisions of lower federal courts, however, may be useful in assessing the reasonableness of a state court's decision.   *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal habeas review.   28 U.S.C. § 2254(e)(1).   A petitioner may rebut this presumption only with clear and convincing evidence.   *Warren v. Smith*, 161 F.3d 358, 360-361 (6th Cir. 1998).   Habeas review is also "limited to the record that was before the state court."   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.   Discussion

### A.   Sentencing Claim

Petitioner first asserts that he is entitled to habeas relief because his sentence is invalid.   Specifically, he asserts that the state trial court imposed a sentence above the guideline range that is unreasonable and

20

disproportionate.   Respondent contends that this claim is not cognizable on habeas review and that it lacks merit.

A sentence within the statutory limits is generally not subject to federal habeas review.  *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999); *see also Hutto v. Davis*, 454 U.S. 370, 373-374 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature).   Claims which arise out of a state court's sentencing decision are not cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeds the statutory limits or is wholly unauthorized by law.  *Lucey v. Lavigne*, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001). Petitioner's sentences are within the statutory maximums for his offenses as a fourth habitual offender.   *See* Mich. Comp. Laws §§ 750.224b (authorizing a maximum sentence of 5 years in prison for a second felony firearm offense); 750.227f (authorizing a maximum sentence of 5 years in prison for felon in possession); 769.12 (authorizing a maximum sentence of life or a lesser term for a fourth habitual offender where the subsequent felony is punishable by a maximum term of five years or more or life).

Consequently, his sentence is insulated from habeas review absent a federal constitutional violation.

Petitioner raised this claim on direct appeal.   The Michigan Court of Appeals denied relief finding that the upward departure was both reasonable and proportionate.   *Tyson*, 2020 WL 256955 at *3-6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[1] Petitioner's claim challenging the trial court's upward sentencing departure and the proportionality of his sentence is not cognizable on federal habeas review because it is a state law claim.   *See Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only."); *Austin v. Jackson*, 213 F.3d 298, 300-301 (6th Cir. 2000) (state court did not abuse its discretion nor violate federal due process by imposing a sentence above the state sentencing guidelines); *Cheatham v. Hosey*, 12

---

[1]To the extent that the state courts did not consider the federal aspects of Petitioner's sentencing claims, this Court's review of such issues is *de novo*.   *See Stermer v. Warren*, 959 F.3d 704, 722-724 (6th Cir. 2020) (discussing the standards of review in cases where the Michigan appellate courts issue form-like orders).   The Court reaches the same result under either a deferential or a *de novo* standard of review.

F.3d 211, 1993 WL 478854, *2 (6th Cir. Nov. 19, 1993) (departure from state sentencing guidelines is a state law issue not cognizable on federal habeas review); *Mitchell v. Vasbinder*, 644 F. Supp. 2d 846, 867 (E.D. Mich. 2009) (denying habeas relief on sentencing departure claim); *see also Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) (ruling that the Eighth Amendment does not require strict proportionality and that Michigan prisoner's claim that his sentence was disproportionate was not cognizable on habeas review).

Any alleged error in departing from the recommended minimum guideline range does not merit habeas relief.  State courts are the final arbiters of state law and the federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review"); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). Habeas relief does not lie for perceived errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Petitioner fails to state a claim upon which federal habeas relief may be granted as to such issues.

A sentence may violate federal due process, however, if it is carelessly

23

or deliberately pronounced on an extensive and materially false foundation which the defendant had no opportunity to correct.   *Townsend*, 334 U.S. at 741; *see also United States v. Tucker*, 404 U.S. 443, 447 (1972) (citing *Townsend*); *United States v. Sammons*, 918 F.2d 592, 603 (6th Cir. 1990) (defendant must have a meaningful opportunity to rebut contested sentencing information).   To prevail on such a claim, a petitioner must show that the court relied upon the allegedly false information.   *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Draughn v Jabe*, 803 F. Supp. 70, 81 (E.D. Mich. 1992).

Petitioner makes no such showing.   He had a sentencing hearing before the state trial court with an opportunity to contest the scoring of the sentencing guidelines and the sentencing decision.   Petitioner fails to establish that the trial court relied upon materially false or inaccurate information in imposing his sentence which he had no opportunity to correct. Habeas relief is not warranted on such a basis.

Petitioner also fails to show that his sentences constitute cruel and unusual punishment under the Eighth Amendment.   The United States Constitution does not require strict proportionality between a crime and its punishment.   *Harmelin*, 501 U.S. at 965.   A sentence that falls within the

maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"   *Austin*, 213 F.3d at 302 (internal citation omitted).   As discussed, Petitioner's sentences are within the statutory maximums for a fourth habitual offender.   The state trial court thus acted within its discretion in imposing sentence and there is no extreme disparity between his crimes and sentences so as to offend the Eighth Amendment. Habeas relief is not warranted on this claim.

### B.   Investigation/Suppression/Present a Defense Claim

Petitioner next asserts that he is entitled to habeas relief because the police failed to properly investigate and obtain or preserve evidence from the crime scene, the prosecution suppressed evidence, and the trial court denied a mistrial motion as to those issues such that he was deprived of the right to present a defense.   Respondent contends that this claim is procedurally defaulted in part and that it lacks merit.

The United States Supreme Court has made clear that due process requires that police (and prosecutors) preserve "clearly exculpatory" evidence in their possession that might not be available to a defendant through other means.   *California v. Trombetta*, 467 U.S. 479, 489 (1984). If such evidence is destroyed, a due process violation occurs irrespective of

the good or bad faith of the police. To prevail on such a claim, a defendant must show that the police destroyed evidence with "an exculpatory value that was apparent before [it] was destroyed." *Id*.

The failure of police to preserve potentially useful evidence for a defendant, however, is not a denial of due process unless the defendant can show bad faith on the part of police. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam). When the government fails to preserve evidentiary material "of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant," a defendant must show that: (1) the government acted in bad faith in failing to preserve the evidence; (2) the exculpatory value of the evidence was apparent before its destruction; and (3) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means. *Monzo v. Edwards,* 281 F.3d 568, 580 (6th Cir. 2002).

A habeas petitioner has the burden of establishing that the police acted in bad faith in failing to preserve potentially exculpatory evidence. *Malcum v. Burt,* 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003). The mere fact that the police had control over evidence and failed to preserve it is

26

insufficient, by itself, to establish bad faith, nor will bad faith be found in the government's negligent failure to preserve potentially exculpatory evidence. *Id.*  "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56.  Further, "where the government is negligent, even grossly negligent, in failing to preserve potential exculpatory evidence, the bad faith requirement is not satisfied."  *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001).

The Supreme Court has also made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly*); *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (confirming that *Donnelly/Darden* is the proper standard).  The standard "is a very general one, leaving courts more

27

leeway ... in reaching outcomes in case-by-case determinations."   *Parker*, 567 U.S. at 48.   "That leeway increases in assessing a state court's ruling under AEDPA" because the court "cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites ... other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable."   *Stewart v. Trierweiler*, 867 F.3d 633, 638-639 (6th Cir. 2017).

It is well-established that a prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   The duty to disclose favorable evidence includes the duty to disclose impeachment evidence.   *United States v. Bagley*, 473 U.S. 667, 682 (1985).   To find a *Brady* violation, the suppressed evidence must be material and favorable to the defendant.   *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985).   Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   *United States v. Bagley*, 473 U.S. 667, 682 (1985).   A *Brady* violation does not occur if previously

undisclosed evidence is disclosed at trial unless the defendant is prejudiced by the late disclosure.   *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986).   Thus, to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the defense and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of guilt.   *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

Lastly, a trial court has broad discretion to grant or deny a motion for a mistrial – and a mistrial is only warranted upon a showing of manifest necessity.   *See Arizona v. Washington*, 434 U.S. 497, 506-510 (1978) (mistrial due to deadlocked jury); *Walls v. Konteh*, 490 F.3d 432, 436 (6th Cir. 2007); *Clemmons v. Sowders*, 34 F.3d 352, 354-355 (6th Cir. 1994). "Manifest necessity" means a "high degree" of necessity.   *Arizona*, 434 U.S. at 506.   The Supreme Court has confirmed the significant deference due a trial court's decision to grant or deny a mistrial, as well as the further deference due the state appellate court's decision on that issue, on federal habeas review.   *See Renico*, 559 U.S. at 772-774 (reversing grant of habeas relief on claim contesting state court's grant of a mistrial due to a deadlocked jury).

29

Petitioner raised this claim on direct appeal.   The Michigan Court of

Appeals denied relief.   The court explained in relevant part:

> While slightly incomprehensible, the gist of defendant's
> contention for his final issue on appeal is that the police
> investigation was inadequate and thereby deprived him of
> potential exculpatory evidence that would have either precluded
> the charges or exonerated him completely. It is assumed that the
> basis for this issue is defendant's request for a mistrial, which
> was premised on the failure of police to obtain fingerprint or blood
> sample results from the evidence at the scene.
>
> ***
>
> "This Court reviews de novo whether defendant suffered a
> deprivation of his constitutional right to present a defense."
> *People v. Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009).
> Similarly, a claim that defendant was deprived of due process
> due to the failure to provide exculpatory evidence also presents
> a constitutional question subject to de novo review. *People v.
> Wilder*, 485 Mich 35, 40; 780 NW2d 265 (2010). To reverse a
> conviction based on the assertion of a due process violation
> requires a defendant to demonstrate that the alleged missing
> evidence was exculpatory or that law enforcement officials acted
> in bad faith. *People v. Hanks*, 276 Mich App 91, 95; 740 NW2d
> 530 (2007). "Failure to preserve evidentiary material that may
> have exonerated the defendant will not constitute a denial of due
> process unless bad faith on the part of the police is shown." *Id*.
> (citations omitted).
>
> In accordance with the principles of due process, "[a] criminal
> defendant has a right to present a defense." *People v. Anstey*,
> 476 Mich 436, 460; 719 NW2d 579 (2006). "Although the right to
> present a defense is a fundamental element of due process, it is
> not an absolute right." *People v. Hayes*, 421 Mich 271, 279; 364
> NW2d 635 (1984). In conjunction with this right, the prosecution
> is required to automatically disclose material, exculpatory
> evidence in its possession. *People v. Schumacher*, 276 Mich App

165, 176; 740 NW2d 534 (2007), citing *Brady v. Maryland*, 373 U.S. 83, 87; 83 S Ct 1194; 10 L.Ed.2d 215 (1963). "Evidence is material only if there is a reasonable probability that the trial result would have been different, had the evidence been disclosed." *People v. Fink*, 456 Mich 449, 454; 574 NW2d 28 (1998) (footnote omitted). The prosecution and police are also required to preserve "potentially exculpatory evidence" in their possession. The failure, however, to preserve such evidence only violates the defendant's right to due process when the prosecution or police act in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57–58; 109 S Ct 333; 102 L.Ed.2d 281 (1988); *Anstey*, 476 Mich at 460–461; *People v. Hunter*, 201 Mich App 671, 677; 506 NW2d 611 (1993).

While his argument is unclear, defendant appears to contend that the failure to have the broken portions of a lamp collected as evidence at the scene available for presentation at trial negatively affected his ability to present a defense. Defendant's version of the events indicated that India Hollis had taken a broken lamp, which was on the porch, and used it to strike Orr during his scuffle with defendant. Oakland County Sheriff Deputy Todd Hunt confirmed the presence of broken ceramic shards and their collection into evidence, as did Deputy Kevin Braddock, with photographs of the shards admitted at trial as an exhibit. Clearly, there was no dispute regarding the existence of the ceramic shards and defendant fails to explain how the physical presence of this evidence would have been either exculpatory or more persuasive to the jury regarding his version of how the events transpired. Because evidence of the broken lamp or ceramic pieces was discussed at trial and photographs of the evidence admitted, the absence of the physical evidence did not preclude defendant from presenting a defense.

Defendant also alludes to a *Brady* violation by the prosecutor in failing to provide defendant with exculpatory evidence. It is, however, problematic that defendant fails to identify any particular evidence deemed to be exculpatory that was

improperly withheld. Consequently, "[d]efendant has not properly presented this issue for appellate review. An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v. Kelly*, 231 Mich App 627, 640–641; 588 NW2d 480 (1998).

Defendant also asserts that the police should have developed other evidence, including the collection and analyzation of blood samples found at the scene. Defendant fails to differentiate between a duty to disclose evidence and a duty to find evidence to disprove a victim's claims. *See People v. Coy* (After Remand), 258 Mich App 1, 22; 669 NW2d 831 (2003). "[T]he police have no constitutional duty to assist a defendant in developing potentially exculpatory evidence." *Anstey*, 476 Mich at 461. In the circumstances of this case, defendant's contention regarding the failure to obtain exculpatory evidence is particularly unavailing. Defendant does not dispute that a physical altercation occurred at the scene with Orr and that both men incurred injuries that bled. As such, the collection of blood evidence was unnecessary as it was acknowledged that an altercation occurred and who was injured. Defense counsel was able, through the questioning of witnesses, to attack the credibility of Orr by obtaining testimony regarding the absence of beer bottles at the scene and Amelia Howard's denial of any expectation that she would be babysitting Hollis's children. Simultaneously, defense counsel was able to elicit testimony to bolster defendant's credibility regarding the presence of ceramic shards to substantiate his version of how events transpired.

In the absence of "a showing of suppression of evidence, intentional misconduct, or bad faith," due process does not require that the prosecution seek and find exculpatory evidence or test evidence for a defendant's benefit. *Coy*, 258 Mich App at 21. There is no basis in the record for finding any bad faith or intentional misconduct by the police or the prosecution, or that

any evidence was suppressed. Furthermore, there is no requirement that the prosecution must negate every reasonable theory consistent with a defendant's innocence. *People v. Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). As a result, defendant's right to due process was not violated by omissions or deficits in the police investigation or by the prosecution's alleged, but unsubstantiated, suppression of evidence.

*Tyson*, 2016 WL 3542384 at *9-11.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.   First, to the extent that Petitioner asserts that his due rights were violated by the police failure to investigate or obtain evidence from the crime scene, e.g. DNA and fingerprints, he fails to state a viable habeas claim.   Contrary to Petitioner's argument, the police do not have a duty to seek out or investigate information or items that may lead to exculpatory evidence.   *Gilmore v. Corrigan*, No. 22-1569, 2022 WL 18141554, *3 (6th Cir. Dec. 1, 2022) (citing cases and denying a certificate of appealability).   "[N]either *Trombetta* nor *Youngblood* impose a duty upon the police to collect evidence."   *Robinson v. Winn*, No. 2:17-CV-13892, 2019 WL 2387127, *8 (E.D. Mich. June 6, 2019).   While due process requires that the police (and the prosecution) preserve and disclose exculpatory evidence, it "does not require the

government to create exculpatory material…." *Stadler v. Curtin*, 682 F. Supp. 2d 807, 819 (E.D. Mich. 2010) (citing cases); *see also Dallas v. Holmes*, 137 F. App'x 746, 754 (6th Cir. 2005); *Cistrunk v. Campbell*, No. 2:12-CV-12568, 2020 WL 376454, *15-16 (E.D. Mich. Jan. 23, 2020) (denying habeas relief on similar claim); *Thomas v. Warren*, 398 F. Supp. 2d 850, 859 (E.D. Mich. 2005) (petitioner was not denied due process by the police or prosecution's failure to timely investigate his alibi where they were under no constitutional obligation to do so).

Second, to the extent that Petitioner asserts that his due process rights were violated by the failure to preserve exculpatory or potentially exculpatory evidence, such as the lamp shards recovered from the scene, he is also not entitled to relief.  Petitioner does not allege any facts which show that the police or the prosecution failed to preserve "clearly exculpatory" evidence or that they acted in bad faith by failing to obtain or preserve potentially exculpatory evidence.  For example, as to the lamp shards, the record indicates that the police recovered them from the scene, the prosecution presented testimony about them, and the trial court admitted photographs of them into evidence.   Petitioner fails to show that the shards themselves were somehow exculpatory or that the government acted in bad

34

faith by failing to preserve them or present them at trial. Conclusory allegations, without evidentiary support, are insufficient to warrant federal habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335-336 (6th Cir. 2012) (citing *Workman* and denying relief on conclusory claims); *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide a basis for an evidentiary hearing on habeas review).

Third, as to any purported *Brady* violation, Petitioner fails to allege facts which show that the prosecution suppressed evidence, that any such evidence was favorable or exculpatory, and/or that any such evidence was material to the question of his guilt. As discussed *supra*, conclusory allegations are insufficient to warrant habeas relief. *Id*.

Lastly, Petitioner fails to show that he was deprived of his right to present a defense or that the trial court erred in denying his request for a mistrial. At trial, it was undisputed that a physical altercation occurred between Petitioner and Milan Orr, that both men suffered injuries, and that Orr was shot. The issue at trial was whether Petitioner acted in self-defense. Petitioner was able to present his claim of self-defense by challenging Milan Orr's version of events, cross-examining the other

prosecution witnesses, and testifying on his own behalf at trial. Petitioner fails to demonstrate how any additional evidence, such as fingerprints, blood samples, or DNA testing, would have benefitted his defense at trial. Given such circumstances, the trial court acted well within its discretion in denying Petitioner's request for a mistrial -- and the Michigan Court of Appeals' ruling affirming that decision was reasonable. Habeas relief is not warranted on this claim.

### C. Ineffective Assistance of Trial Counsel Claims

Petitioner next asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the trial court's jury instructions on self-defense, for failing to request a specific self-defense instruction as to the felony firearm charge, and for failing to make objections or do more relative to the foregoing issues. Respondent contends that these claims lack merit.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of trial counsel. First, a petitioner

must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, a petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair proceeding. *Id*.

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id*. at 690. A reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 689. There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id*. "On balance, the benchmark for

judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance.   "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."   *Harrington*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."   *Id*.

Petitioner challenged the trial court's jury instructions as a distinct issue on direct appeal (but does not do so here) and raised a related ineffective assistance of trial counsel claim (as he arguably does here). The Michigan Court of Appeals first ruled that the jury instructions were proper under state law, *see Tyson*, 2016 WL 3542384 at *1-5, and then

38

ruled that Petitioner failed to show that trial court erred under the *Strickland*

standard.   As to the latter, the court explained in relevant part:

> Alternatively, defendant contends that his trial counsel was ineffective for (a) failing to request a more thorough self-defense instruction referencing all of the firearm charges or (b) to seek a more "robust" instruction on self-defense.

> As discussed in *People v. Payne*, 285 Mich App 181, 188–189; 774 NW2d 714 (2009):

>> In *People v. Carbin*, 463 Mich 590, 599–600; 623 NW2d 884 (2001), our Supreme Court explained the test for determining whether a criminal defendant has been denied the effective assistance of counsel. A defendant must first show that defense counsel's performance was deficient and, second, that counsel's "'deficient performance prejudiced the defense.'" *Id*. at 600 (citation omitted); *see also Strickland v. Washington*, 466 U.S. 668; 104 S Ct 2052; 80 L.Ed.2d 674 (1984). Whether defense counsel's performance was deficient is measured against an objective standard of reasonableness. *People v. Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin*, 463 Mich at 600.

> Defense counsel identified defendant's assertion of self-defense in his opening statement to the jury. Defense counsel also successfully disputed the prosecutor's contention that self-defense was not an appropriate jury instruction because defendant's claim was that the discharge of the firearm was an accident during his struggle with Orr and that he did not have

control of the weapon when it fired. In his closing argument, defense counsel also referenced self-defense, as did the prosecutor on rebuttal closing argument.

Defendant was not entitled to a self-defense instruction on the armed robbery charge because he was "engaged in the commission of a crime" when the force was used. MCL 780.972(2). As discussed, the trial court did reference the felon in possession of a firearm charge in the preface to the instruction on self-defense. Hence, in this regard, an error did not occur and counsel cannot be deemed ineffective. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v. Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant also contends trial counsel was ineffective for failing to seek a more "robust" self-defense instruction, such as CJI2d 11 .34b.4 To the extent CJI2d 11.34b is applicable, a review of the jury instructions on self-defense incorporated the provisions of the cited criminal jury instruction. Specifically, as part of the jury instructions, the trial court stated:

> Further, a person is not required to retreat if the person retreat—if the person A, has not or is not engaged in the commission of a crime at the time the deadly force is used. And B, has a legal right to be where the person is at the time. And C, has an honest and reasonable belief that the use of deadly force is necessary to prevent the evident death or great bodily harm of the person or another.

Thus, the jury instruction provided on self-defense, viewed in context and in its entirety, encompassed the material defendant alleges was improperly omitted due to the ineffective assistance of his counsel. Based on the inclusion of the substantive content of CJI2d 11.34b in the instruction given to the jury, defendant's contention that his trial counsel was ineffective for failing to

provide a more "robust" self-defense instruction is without merit.

*Tyson*, 2016 WL 3542384 at *5-6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Given the Michigan Court of Appeals' ruling that the trial court's jury instructions were proper under state law, Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct. Trial counsel cannot be deemed ineffective for failing to make a futile or meritless objection or argument.  *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020); *Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010). Petitioner fails to show that trial counsel was ineffective in this regard.

Additionally, to the extent that Petitioner asserts that trial counsel was ineffective for not challenging the alleged failure to investigate, collect, preserve and/or disclose evidence, and for not objecting to the denial of his mistrial request, he is similarly not entitled to relief.[2]  Given the state courts' rulings and this Court's ruling that such issues lack merit, Petitioner cannot

---

[2] The Court notes that these particular ineffective assistance of trial counsel claims have likely not been fully exhausted in the state courts and are now procedurally defaulted, *see* discussion *infra*.  Nonetheless, the claims also lack merit, even under a *de novo* standard of review.

establish that trial counsel erred and/or that he was prejudiced by counsel's conduct.   As explained *supra*, counsel cannot be ineffective for failing to make futile or meritless objections or arguments.   *Id*.   Petitioner fails to establish that trial counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on these claims.

### D.   Ineffective Assistance of Appellate Counsel and Other Collateral Review Claims

Petitioner next asserts that he is entitled to habeas relief because appellate counsel was ineffective for failing to raise his pro per direct appeal and collateral review issues on direct appeal.   Petitioner also seems to assert that he is entitled to habeas relief based on other claims that he first raised on state collateral review.   Respondent contends that such claims have not been fully exhausted in the state courts and are now procedurally defaulted.[3] Respondent further contends that the ineffective assistance of appellate counsel claim lacks merit.

A prisoner filing a habeas petition under 28 U.S.C. §2254 must first

---

[3]The Court also has discretion to sua sponte raise the issue of procedural default.   *See Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013); *Wood v. Milyard*, 566 U.S. 463, 465 (2012) ("a court may consider a statute of limitations or other threshold bar the State failed to raise in answering a habeas petition"); *see also Cradler v. United States*, 891 F.3d 659, 665-666 (6th Cir. 2018) (same).

exhaust all state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("state prisoners must give the state courts one full fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). To satisfy this requirement, the claims must be "fairly presented" to the state courts, meaning that the petitioner must have asserted both the factual and legal bases for the claims in the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *see also Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *McMeans*). The claims must also be presented to the state courts as federal constitutional issues. *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). Furthermore, each issue must be presented to both the Michigan Court of Appeals and the Michigan Supreme Court to satisfy the exhaustion requirement. *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990); *Welch v. Burke*, 49 F. Supp. 2d 992, 998 (E.D. Mich. 1999). While the exhaustion requirement is not jurisdictional, a "strong presumption" exists that a petitioner must exhaust all available state remedies before seeking federal habeas review. *Granberry v. Greer*, 481 U.S. 129, 131, 134-135 (1987). The burden is on the petitioner to prove exhaustion. *Rust*, 17 F.3d at 160.

Petitioner did not properly exhaust his ineffective assistance of appellate counsel and other collateral review claims in the state courts. While he raised those claims in his motion for relief from judgment before the state trial court and then filed a delayed application for leave to appeal with the Michigan Court of Appeals, he did not seek leave to appeal with the Michigan Supreme Court.   Petitioner's ineffective assistance of appellate counsel claim, and any others first presented on collateral review in the state courts, are therefore unexhausted.

Moreover, Petitioner no longer has an available means by which to exhaust those claims since he has already filed a motion for relief from judgment with the state trial court.   Any attempt to file a second motion for relief from judgment would be futile.   Under Michigan Court Rule 6.502(G)(1), a state criminal defendant is generally permitted to only file one post-conviction motion for relief from judgment.   *Gadomski v. Renico*, 258 F. App'x 781, 783 (6th Cir. 2007); *Hudson v. Martin*, 68 F. Supp. 2d 798, 800 (E.D. Mich. 1999).   Petitioner's remaining claims do not fall within the exceptions for filing a second motion, *see* Mich. Ct. R. 6.508(G)(2) (exceptions include a retroactive change in the law or newly-discovered evidence and waiver of the rule due to a significant possibility of innocence).

Because Petitioner has not fully exhausted his ineffective assistance of appellate counsel claim and other collateral review claims in the state courts and no longer has an available remedy by which to do so, those claims are now procedurally defaulted.   When a habeas petitioner fails to properly present a claim to the state courts and is barred from pursuing further relief under state law, he or she has procedurally defaulted that claim for purposes of federal habeas review.   *See Gray v. Netherland*, 518 U.S. 152, 161-162 (1996); *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) (citing *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002)).

Federal habeas relief is precluded on claims which have not been presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977).   A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice.   *Coleman v. Thompson*, 501 U.S. 722, 750-751 (1991); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Gravley v. Mills*, 87 F.3d 779, 784-785 (6th Cir. 1996).   To establish cause, a petitioner must establish that some external impediment frustrated his or her

ability to comply with the state's procedural rule.   *Murray v. Carrier*, 477 U.S. 478, 488 (1986).   A petitioner must present a substantial reason to excuse the default.   *Amadeo v. Zant*, 486 U.S. 214, 223 (1988).

Petitioner fails to demonstrate cause to excuse this procedural default. Any alleged failings by appellate counsel with regard to his direct appeal do not excuse Petitioner's failure to properly exhaust his claims in the Michigan Supreme Court on collateral review.   Additionally, a prisoner's pro se status or lack of knowledge about state court rules does not constitute cause to excuse a procedural default.   *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995); *Robertson v. Abramajtys*, 144 F. Supp. 2d 829, 838 (E.D. Mich. 2001).   Because Petitioner fails to establish sufficient cause to excuse this procedural default, the Court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

Lastly, Petitioner fails to demonstrate that a fundamental miscarriage of justice has occurred.   The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of someone who is actually innocent.   *Murray v. Carrier*, 477 U.S. 478, 479-480 (1986).   To be credible, a claim of actual innocence requires a

petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial.   *Schlup v. Delo*, 513 U.S. 298, 324 (1995).   Actual innocence means factual innocence, not mere legal insufficiency.   *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Petitioner makes no such showing.   His contention that his claims have merit does not establish his actual innocence and his own self-serving assertions of innocence (based on self-defense) are insufficient to support an actual innocence claim.   "A reasonable juror surely could discount [a petitioner's] own testimony in support of his own cause."   *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (citing cases).   Petitioner fails to show that he is actually innocent.   His ineffective assistance of appellate counsel claim, and any other claims first raised on collateral review in the state courts, are thus barred by procedural default and do not warrant federal habeas relief.

### E.    State Law Claims

Petitioner also asserts that he is entitled to habeas relief based upon perceived violations of Michigan law, relative to his claims.   A federal court, however, may only grant habeas relief to a person who is "in custody in violation of the Constitution or laws or treaties of the United States."   28

47

U.S.C. § 2254(a).   Trial court errors in the application of state law are not cognizable as grounds for federal habeas relief.   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").   State courts are the final arbiters of state law and federal courts will not intervene in such matters.   *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).   Petitioner fails to state a claim upon which habeas relief may be granted as to any alleged violations of state law.

## F.   New, Conclusory Claims

Lastly, Petitioner seems to assert that he is entitled to habeas relief based on unexplained allegations and/or claims, such as the sufficiency of the evidence, which have not been properly presented to the state courts on direct appeal or collateral review.

Such claims do not justify relief.   First, as discussed, conclusory allegations without evidentiary support are insufficient to warrant federal habeas relief.   *See Workman*, 178 F.3d at 771; *see also Wogenstahl*, 668 F.3d at 335-336; *Washington*, 455 F.3d at 733.   Thus, to the extent that Petitioner makes unexplained allegations or generally asserts violations of

his constitutional rights, he fails to state claims upon which habeas relief may be granted in his pleadings.

Second, any new claims raised for the first time on habeas review have not been properly exhausted in the state courts and are now procedurally defaulted.  *See* discussion, *supra* (regarding the ineffective assistance of appellate counsel claim and the other collateral review claims).  Petitioner fails to show that he exhausted any new claims, such as an insufficient evidence claim, in the state courts.  Such claims are therefore unexhausted.  Moreover, Petitioner no longer has an available means by which to exhaust any new claims since he has already filed a motion for relief from judgment with the state trial court and any attempt to file a second motion for relief from judgment would be futile.  Because Petitioner has not exhausted any new claims in the state courts and no longer has an available remedy by which to do so, such claims are now procedurally defaulted.  *Id*.

Again, as discussed *supra*, federal habeas relief is precluded on claims which have not been presented to the state courts in accordance with the state's procedural rules, absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a

showing of a fundamental miscarriage of justice.   *Id*.

Petitioner fails to establish cause to excuse this procedural default. Any deficiencies by appellate counsel on direct appeal do not excuse Petitioner's failure to properly exhaust claims on collateral review.   And Petitioner's pro se status or lack of knowledge about state court rules does not constitute cause to excuse a procedural default.   Because Petitioner fails to establish sufficient cause to excuse this procedural default, the Court need not address the issue of prejudice.   *Id*.   Petitioner also fails to demonstrate that a fundamental miscarriage of justice has occurred.   *Id*. Any new claims are thus unexhausted, barred by procedural default, and do not warrant habeas relief.

## V.    Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims.   Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).   A certificate of appealability may issue only if Petitioner makes "a substantial showing of

the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if a petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). When a court denies relief on procedural grounds, a certificate of appealability should issue if reasonable jurists would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and if reasonable jurists would find it debatable whether the court was correct in its procedural ruling. *Id*. Petitioner makes no such showing. Accordingly, the Court **DENIES** a certificate of appealability.

Lastly, the Court concludes that an appeal from this decision cannot be taken in good faith. *See* Fed. R. App. P. 24(a). Accordingly, the Court **DENIES** Petitioner leave to proceed in forma pauperis on appeal.

**IT IS SO ORDERED**.

s/Nancy G. Edmunds
NANCY G. EDMUNDS
United States District Judge

Dated:   May 29, 2025